SC

1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9   Christopher Brightly,

10                              Plaintiff,

11   v.

12   Corizon Health Inc., et al.,

13                              Defendants.

14

No.   CV 21-00127-TUC-JCH

**ORDER**

15        Plaintiff Christopher Brightly, who is confined in the Arizona State Prison
16   Complex-Tucson,[1] filed a pro se civil rights Complaint pursuant to 42 U.S.C.
17   § 1983 (Doc. 1)[2] and a motion for injunctive relief (Doc. 6).  The Court ordered Defendants
18   Corizon, Bell, Salyer, Centurion, Hines, and Elliott to answer the Complaint, and dismissed
19   the remaining Defendants without prejudice.   The Court also ordered Defendants
20   Centurion, Hines, and Elliott to respond to Plaintiff's motion for a preliminary injunction.
21   Defendants filed their response in opposition to the motion (Doc. 32) and Plaintiff, now
22   represented by counsel, filed his reply (Doc. 34).  The parties also filed a Motion for
23   Limited Discovery (Doc. 35), a Motion to Strike (Doc. 38), a Notice and Request to
24   Consider Records (Doc. 40), and an Emergency Supplement (Doc. 44), which revealed
25   Plaintiff had been hospitalized on two occasions.  The Court denied as moot Plaintiff's

26
27        [1]  Until recently, Plaintiff was in an inpatient rehabilitation facility following a recent hospitalization.

28        [2] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

motion for limited discovery, granted Defendants' motion to strike, granted Defendants' request to consider records, and ordered a response to Plaintiff's Emergency Supplement (Doc. 46).[3]  Defendants filed a response to Plaintiff's Emergency Supplement (Doc. 47), and Plaintiff filed a reply (Doc. 48).  Most recently, Plaintiff has filed a "Second [sic] Emergency Motion for Ruling" (Doc. 49).  The Court will deny the motion for injunctive relief without prejudice and will deny Plaintiff's other pending motions.

## I.    Background[4]

In 2016, Plaintiff was incarcerated in the Arizona Department of Corrections (ADOC).  In early to mid-2019, he fell on his left shoulder tearing rotator cuff tendons.  In approximately June 2019, Plaintiff was transported to a hospital emergency room suffering from spinal meningitis caused by coccidiomycosis, i.e., Valley Fever,[5] hydrocephalus, and bone and nerve damage to his spine.[6]  Plaintiff was hospitalized for approximately three weeks during which he received a cervical laminectomy, and was placed on fluconazole, an antifungal medication, to stave off a relapse of his disseminated Valley Fever.  Following release from the hospital, Plaintiff went to a rehabilitation center for three weeks where he received physical examinations and physical therapy.  The physical therapists and doctors there determined that tendons in Plaintiff's shoulders were torn and recommended orthopedic consults and extensive physical therapy.

About the time of his return to prison from a rehabilitation facility, Centurion became the healthcare provider for ADOC prisoners.  At that time, Plaintiff experienced

---

[3]  Plaintiff also filed an "Emergency Motion for Hearing on Preliminary Injunction" (Doc. 45).

[4]  This summary is based upon the parties' undisputed filings and is limited to facts relevant to the motion.  This summary does not purport to recount the entirety of Plaintiff's healthcare over this period.

[5]  Records submitted by Defendants reflect Plaintiff contracted Valley Fever, which disseminated to his meninges, resulting in meningitis and, apparently, damaged his cervical spine.  Although unclear, it appears his hydrocephalus was caused by his disseminated Valley Fever.  Following this hospitalization, Plaintiff was prescribed fluconazole, an antifungal medication.

[6]  Plaintiff also suffers from seizures, which have been well-managed by taking 1000mg of Keppra daily.

pain in his extremities and spine, and spasticity as a result of his medical conditions.  He also had pain in his shoulders, particularly his left shoulder.  Centurion provider Jillian Riley sought authorization to obtain a second opinion concerning Plaintiff's left shoulder and, in September 2019, Plaintiff was sent to Simons Physical Therapy for evaluation. Physical therapist Stacy Simons opined that the tendons in Plaintiff's shoulders were torn and required an MRI and surgical intervention.  It is unclear what follow-up care Plaintiff received following the Simons' assessment.

In May 2020, Plaintiff had a "Health Services Encounter" (HSE) with Defendant Hines, a nurse practitioner, regarding ongoing pain in his shoulders and knee.  Plaintiff informed Hines of Simons' September 2019 recommendations for an MRI and surgery on his shoulders.  According to Plaintiff, Hines examined him and told him he needed both shoulder joints and his right knee replaced but allegedly did not treat his continuing pain and failed to either schedule or request authorization for the recommended procedures.

In July or August 2020, Plaintiff was examined by an orthopedist who prescribed orthotic shoes with a lift in the right shoe, to adjust for the differences in the lengths of Plaintiff's legs, and an orthotic foot/ankle brace for drop foot in his right foot.

On September 24, 2020, Dr. Kendra Williams Drake of CMG Western Neuro evaluated Plaintiff concerning his coccidioidal meningitis, seizure disorder, epilepsy, degeneration of cervical intervertebral disc, spinal stenosis in the cervical region, lumbosacral stenosis, spasticity, and neuralgia. (Doc. 32-1 at 58-61.)  She noted Plaintiff's last CT head scan had been performed in May; Plaintiff had decreased strength in his upper extremities bilaterally and inability to fully lift his arms; and on examination Plaintiff's gait was spastic and clonus at the ankles bilaterally.  (*Id.* at 58, 60.)  She also noted Plaintiff had spasticity in both the upper and lower extremities, but his lower extremities were more symptomatic.  (*Id.* at 60.)  Drake recommended Plaintiff continue taking Baclofen 20mg three times daily, receive physical therapy, and be prescribed a benzodiazepine to help with his spasticity.  (*Id.*)  She further recommended an MRI brain scan with and without contrast. (*Id.* at 61.)  She stated she would request his medical records regarding his laminectomy

1   and meningitis.  (*Id.*)

2        In a September 28, 2020 HSE, Defendant Hines noted Plaintiff's unsteady gait and

3   decreased range of motion (ROM) in both shoulders in flexion and abduction.  (*Id.* at 63.)

4   Hines ordered x-rays of both shoulders.  (*Id.* at 67-68.)  She reported she would discuss

5   switching Plaintiff to Cymbalta from Paxil with behavioral health.  (*Id.* at 68.)

6        According to an October 15, 2020 HSE, Hines reviewed Plaintiff's neurology report

7   and shoulder x-rays with him and answered his questions.  (*Id.* at 80.)  She reported telling

8   Plaintiff the neurologist had not offered "any new insights."  (*Id.* at 85.)  She noted Plaintiff

9   reported having fallen a year before, landing on his left arm, and suffering arm and shoulder

10  weakness since, caused by tearing of shoulder tendons and ligaments.  (*Id.* at 80.)  She

11  assessed Plaintiff as having left hemiplegia and left shoulder pain.  (*Id.* at 83.)  She ordered

12  an MRI of his left shoulder and stated she would closely monitor Plaintiff because he had

13  discontinued taking several medications on his own.  (*Id.* at 85.)

14       In late October or early November 2020, an MRI of Plaintiff's left shoulder was

15  performed, which showed tears in three of his left rotator cuff tendons.  (*Id.* at 105.)  In late

16  October, Defendant Hines prescribed Plaintiff gabapentin 300mg three times daily to see

17  if it helped with his nerve pain and spasticity.  (*Id.* at 88, 92.)

18       According to a November 23, 2020 HSE, Plaintiff reported falling a couple of weeks

19  before and injuring his right thigh, knee, and ankle.  (*Id.* at 105-110.)  Hines noted an ankle

20  x-ray showed a possible avulsion fracture of the medial malleolus and Plaintiff's left

21  shoulder MRI showed tears in three left rotator cuff tendons.  (*Id.* at 105, 110.)  According

22  to the HSE, Plaintiff reported right ankle and knee pain and a left rotator cuff injury.  (*Id.*

23  at 108.)  Hines ordered an MRI of Plaintiff's right ankle, an x-ray of his right knee, and an

24  orthopedic consult concerning his left shoulder.  (*Id.* at 109.)

25       On December 20, 2020, Dr. William Denq, an orthopedist, saw Plaintiff regarding

26  his left shoulder.  (*Id.* at 130.)  Denq noted: Plaintiff demonstrated a significant loss of

27  function in his left shoulder from a rotator cuff tear; had additional bilateral weakness in

28  his grip and elbow flexion/extension, making Denq suspect part of Plaintiff's shoulder

weakness was secondary to cervical issues; noted similar weakness of his right shoulder; and concluded the MRI warranted a surgical consultation with Dr. Hamilton for consideration of arthroplasty and further management.  (*Id.* at 131. 150; Doc. 32-3 at 40.)

In a December 29, 2020 report concerning an MRI of Plaintiff's right ankle, Dr. Daniel Amirhamzeh noted a "[s]hort segment longitudinal split tear of the peroneus brevis just distal to the malleolus with reconstitution of the tendon fibers distally" and mild degree tenosynovitis of the tendon sheath but the peroneus longus tendon was intact.  (Doc. 32-2 at 3-4.)

On January 7, 2021, Plaintiff was fitted at a Hanger Clinic for an "ankle foot orthosis" for foot drop of his right foot, a right foot lift, and shoes, which were ordered.  (*Id.* at 25.)

On February 1, 2021, Defendant Elliott reviewed Dr. Drake's neurology recommendations with Plaintiff; prescribed him Baclofen 20mg three times daily and Trileptal, an anti-seizure medication, 150mg daily; and requested MRI film and report concerning Plaintiff's right ankle.  (Doc. 32-3 at 7-12.)

On February 3, 2021, Dr. Derek McAllister performed a brain MRI, which he compared to Plaintiff's 2020 brain MRI.  (*Id.* at 29-30.)  As his impressions, he stated

> 1. Stable nonspecific prominence of the ventricular system.  The differential considerations again include, but are not limited to idiopathic intracranial hypertension and normal pressure hydrocephalus.  Clinical correlation and attention on follow-up recommended.

> 2.  Right maxillary silent sinus syndrome.

(*Id.*)

On February 11, 2021, Dr. Hamilton, an orthopedist, saw Plaintiff concerning possible orthopedic surgery on his left shoulder and "Recommend[ed] an EMG of L[eft] U[pper] E[xtremity] to evaluate for muscular denervation, follow up with neurology/neurosurgery to review and f/u myelopathy and central cord syndrome.  No orthopedic surgical intervention recommended."  (*Id.* at 32-41.)  Dr. Hamilton recommended an EMG to assess the extent to which surgery would be effective in relieving

his shoulder pain.  (*Id.* at 35-41.)

On February 13, 2021, Defendant Elliott saw Plaintiff regarding pinching of his nerves in and around his cervical laminectomy, increasing balance difficulty, and head pressure/pain.  (*Id.* at 44-50.)  Elliott reported: having a long discussion with Plaintiff regarding neuropathic pain and an infectious disease neurology consult; telling Plaintiff an infectious disease consult was not indicated as Plaintiff did not have acute coccidiomycosis and was taking Diflucan (fluconazole); telling Plaintiff a neurology consult had been placed after review of his brain MRI; reviewing the MRI results with him; and informing Plaintiff of the benefits of Trileptal for neuropathic pain.  (*Id.* at 44.)

Beginning in February 2021, Plaintiff reported increasing pain in his right shoulder, which ibuprofen was not alleviating and for which he sought an MRI of his right shoulder. (Doc. 32-4 at 18-26.)  Plaintiff continued to report right ankle, knee, hip, and shoulder pain. (*See e.g.*, *id.* at 32-4 at 85-100; Doc. 32-5 at 1-2.)

On March 5, 2021, Elliott accepted an alternative treatment plan (ATP) for Plaintiff's left shoulder, i.e., an EMG to evaluate for muscular denervation.  (Docs. 32-3 at 50 to 32-4 at 1.)  She noted follow-up with neurology/neurosurgery to review and "TX myelopathy and central cord syndrome to wait pending EMG results before consulting neurosurgery; and Dr. Hamilton had not recommended an orthopedic surgical intervention. (*Id.*)  Elliott separately noted Dr. Hamilton had recommended an EMG and a referral to neurology/neurosurgery for myelopathy and central cord syndrome.  (Doc. 32-4 at 35-37, 38-43, 44-49, 82-84.)  Plaintiff was scheduled to be seen at a neurological clinic.  (*Id.* at 34.)

According to a March 29, 2021 HSE, Elliott informed Plaintiff he would be weaned off gabapentin because he did not then qualify for "a non-formulary drug like this" and discussed starting a different medication; Elliott decreased Plaintiff's gabapentin from three times daily to twice daily.  (*Id.* at 62-67.)

On April 6, 2021, Dr. Ales Hlubocky performed an EMG.  (*Id.* at 69-71.)  Dr. Hlubocky reported upper limb nerve conduction was normal and "[t]he needle examination

demonstrated enlarged motor unit potentials and reduced recruitment in multiple left C5-T1 innervated muscles[.]" (*Id.*)  In his reported impression, Dr. Hlubocky stated,

> The test results are consistent with a chronic neurogenic process affecting the left C5-T1 myotomes with possible localization in the spinal roots (multiple C5-T1 radiculopathies) and/or anterior horns of the spinal cord (cervical myelopathy).  There is no convincing electrophysiological evidence of left upper extremity focal neuropathy or brachial plexopathy to explain the symptoms.

(*Id.*)

In an April 9, 2021 HSE, Elliott noted Plaintiff's history of spinal meningitis due to Valley Fever and hydrocephalus, possibly normal pressure hydrocephalus, followed by neurosurgery with a routine MRI to see if a shunt was indicated.  (*Id.* at 73-80.)  She noted Plaintiff reported neuropathic pain, he was being weaned off gabapentin but had refused alternatives such as Cymbalta, and his EMG indicated shoulder surgery would not benefit him because he likely had myalgias impacting his pain.  (*Id.* at 78.)  She ordered Plaintiff an extra mattress to help with his spinal pain.  (*Id.* at 80.)

According to May 4, 2021 HSEs, Elliott reported Dr. Hamilton had indicated Plaintiff had permanent C4-C5 dysfunction and would not benefit from rotator cuff surgery.  (Doc. 32-5 at 10-29.)  Elliott also noted x-rays of Plaintiff's right shoulder were negative for concern.  (*Id.* at 18, 42.)  Elliott further noted:

> The EMG showed "upper limb nerve conduction studies were normal" and test results are consistent with a chronic neurogenic process affecting the left C5-T1 myotomes with possible localization in the spinal roots and/or anterior horns of the spinal cord consistent with cervical myelopathy.  IM is s/p cervical laminectomy of C3-C7.  He is supposed to return to see Dr Hamilton after the EMG is done and he is seen by neurology.  He has an authorization to see neurology but scheduling was not done due to wanting to get results of EMG testing.  IM is concerned with not being able to clean himself well with the toilet paper due to claw hands.

(*Id.* at 21.)  Elliott indicated Plaintiff was going to start taking Cymbalta, with increased dosing for optimal benefits, Plaintiff would be scheduled to be seen by neurology to review

brain MRI and EMG results, and after Plaintiff's neurology consult, she would order a consult with Dr. Hamilton to discuss surgical options for his left shoulder.  (*Id.* at 23.)

In a May 4, 2021 Condensed Consultation Request, Elliott noted Plaintiff had been seen by orthopedics and surgery was unlikely to benefit him, but physical therapy and muscle strengthening was likely to benefit his left shoulder; she requested authorization for physical therapy.  (*Id.* at 79-80.)  According to a Consultation Request Action, on May 13, 2021, Plaintiff was scheduled for a neurology follow-up in July as the first available appointment due to a backlog caused by the pandemic.  (*Id.* at 82.)  Elliott reduced Plaintiff's gabapentin to a single dose daily effective May 14, 2021.  (*Id.* at 45.)

From at least May 5, 2021 until May 11, 2021, Plaintiff refused his Trileptal medication for unknown reasons.  (*Id.* at 83-85.)

On June 8, 2021 Plaintiff presented to the medical department complaining of knee pain.[7]  (Doc. 40-1 at 2-9; 24.)  Later, on June 9, 2021 Plaintiff's cellmate brought Plaintiff in a wheelchair to medical.  (*Id.* at 11-18, 24-28.)  Plaintiff was unable to sit upright in the wheelchair, was diaphoretic, dizzy, had blurred vision, nausea with vomiting, and a headache.  (*Id.* at 12.)  An "ALS," Advance Life Support, was called but later decreased to a "BLS," Basic Life Support.  (*Id.* at 11, 12, 24.)  Nurse Graybill noted "c/o extreme HA [headache], neck, shoulder pain, and blurry vision."  (*Id.*)  She also noted slurred speech, confusion, tremors, and an inability to move either arm.  (*Id.* at 12, 13.)  Plaintiff was transported to a Banner Hospital with an admitting diagnosis of "cord compression vs meningitis," and was subsequently transferred to a different Banner hospital for treatment. (*Id.* at 11-14, 33.)

According to a June 10, 2021 hospital report, "MRI findings concerning for progressing [central nervous system] coccidiomycosis," with "[m]ost likely progressive cocci," and "would rule out other causes by lumbar puncture."  (*Id.* at 35.)  Plaintiff was described as "a high[-]risk patient due to [central nervous system] coccidiomycosis."  (*Id.*)

---

[7] According to records submitted by Defendants, as of June 3, 2021, Plaintiff was no longer receiving gabapentin but was receiving Baclofen, 20 mg and fluconazole, 200 mg, among other medications.  (*Id.* at 15.)

On June 11, 2021, neurosurgeons performed a revision laminectomy of Plaintiff's cervical spine, apparently to remove infection. According to his discharge summary, on June 12, 2021, Plaintiff had a "cervical intramedullary cyst fenestration in setting of cocci-meningitis with no complications." (Doc. 47-1 at 3.) During his hospitalization, Plaintiff was prescribed 1200mg of gabapentin three times daily, among other medications.

A June 17, 2021 progress report noted "Finding primarily thought to be secondary to chronic infectious/inflammatory changes secondary to patient's known coccidioidomycosis spinal meningitis." (*Id.* at 55.) A June 21, 2021 progress note reported the intention to consult with Valley Fever specialists. (*Id.* at 142.) As of a June 22, 2021 progress note, fluconazole was discontinued "due to treatment failure," and Plaintiff began to be given different antifungal medications. (*Id.* at 103, 127.)

During this hospitalization, Dr. Lim, an infectious disease physician, treated Plaintiff. As his "Impression," Dr. Lim stated Plaintiff had presented

> with CNS [central nervous system] coccidioidomycosis [and was] admitted for progressive neurological deficits and chronic meningitis with MRI findings concerning for progressing CNS coccidiomycosis. He underwent revision laminectomy 6/11 by neurosurgery. Awaiting CSF studies. . . . Most likely progressive cocci. Continues on liposomal ampho B and we have restarted fluconazole and we are assessing a drug level to determine if he failed due to low drug levels, i.e., hypermetabolism.

(*Id.*) Further, he stated

> Most recent MRI [10 June 2021] revealed significant leptomeningeal and pachymeningeal enhancement of the cervical spine, most prominent at the level of prior surgical field which may represent ongoing meningitis. He will need lifelong treatment (and lifelong, regular follow up with infectious diseases specialist) because he may have more relapses which can be potentially fatal. The optimal dose of fluconazole remains unclear, but no less than 800 mg daily seems reasonable in this patient's case given the relapses. Fluconazole level on 6/14 was 25.2, which would be expected to be therapeutic, suggesting treatment failure. Also consider mechanical issue that was corrected with surgery. Discussed with neurosurgery potential for VP shunt. There was concern for VP shunt to rapidly fail in the setting of severe infection. Tentative plan to switch from fluconazole to posaconazole. If he fails and progresses on posaconazole, would likely need VP shunt, but will need to reassess at that time.

TERMPSREF

- 9 -

#Coccidioidal meningitis-related hydrocephalus: Current MRI reveals no further progression
#Coccidioidal meningitis-related cervical myelopathy (spinal cord cyst; cervical spinal cord expansion at C4-C6 levels; severe multifocal cervical spinal cord tethering and deformity resulting in significant cord compression at the level of C4-05; syringomyelia from craniocervical junction to 14-T5): S/P Revision C4 laminectomy and fenestration of intramedullary cyst [11 June 2021].
#Lumbar stenosis. . . .

(*Id.*)

Dr. Lim recommended a follow-up CSF fungal culture and a cocci CSF CF titer. (*Id.* at 185.) As treatment, he recommended discontinuing liposomal amphotericin B (an intravenous antifungal) and continuation of Posaconazole 200mg, an antifungal, twice daily, a check of Plaintiff's Posaconazole level on June 15, and any necessary adjustments on an outpatient basis. (*Id.*) He recommended a complete blood count and comprehensive metabolic panel every week until liver function tests normalized, then every two weeks, and if stable, every month thereafter. (*Id.*) Plaintiff was scheduled for follow-up appointments with an infectious disease clinic and, a few weeks later, to be seen by Dr. Lim and to be seen at a neurosurgery clinic following discharge.

In June 25, 2021 physical therapy notes, the therapist agreed with an occupational therapist that Plaintiff should be released to a rehabilitation facility, noting significant upper and lower extremity weakness. (*Id.* at 171, 172.) Plaintiff's discharge medication list included gabapentin 1200 mg three times daily, lidocaine patches, 650 mg acetaminophen, and Posaconazole 200 mg twice daily, among others. (*Id.* at 173, 181.)

On June 26, 2021, Plaintiff was transferred to Allegiant Healthcare of Phoenix, a rehabilitation facility. Banner medical staff indicated Plaintiff was scheduled for outpatient follow-up appointments with neurosurgery, neurology, and infectious disease staff. (*Id.* at 180, 181.) The plan of care for Plaintiff's neuropathic pain, migraines, and spasticity following release was to continue Tylenol 650mg, Baclofen 20mg, gabapentin 1200mg three times daily, and Posaconazole 200mg twice daily, among other medications. (*Id.* at 173, 181.) While at Allegiant, Plaintiff received occupational and physical therapy and

continued receiving 1200mg of gabapentin three times daily and Posaconazole 200mg twice daily, among other medications.  (*Id.* at 17-25.)

On July 2, 2021, Plaintiff checked out of Allegiant, apparently against medical advice, and was transported by ambulance to an ADOC infirmary.[8]  (Doc. 47-2 at 1-13.) Prior to his June hospitalization, Plaintiff was weaned off gabapentin and upon his return to prison he did not receive gabapentin; it is unclear whether Plaintiff's Centurion providers knew the level of gabapentin he had been receiving while hospitalized and in rehabilitation. According to July 5, 2021 HSEs, Plaintiff reported significant pain to Elliott during rounds and asked to receive gabapentin again; Elliott noted "discuss with RMD alternatives for neuropathic pain other than gabapentin or nortriptyline." (Doc. 47-3 at 23-30.)  The same day, Plaintiff asked for an alternative medication to help with nerve pain and sleep; NP Riley was contacted and stated she did not want to prescribe him any additional medications.  (*Id.* at 19-22.)  Plaintiff reported that upon arrival from the rehabilitation facility, he had abruptly stopped receiving a high dose of gabapentin for nerve damage, which was unsafe, and he had not been provided an alternative medication.  (Doc. 47-4 at 10-12.)  On July 5, 2021, Plaintiff began receiving Posaconazole again, but at half the dose, 100mg twice daily rather than 200mg twice daily as ordered by Dr. Lim, Plaintiff's treating infectious disease physician.[9]  (Doc. 47-3 at 19-22.)

Plaintiff's infectious disease consult was rescheduled from July 2 to July 12, 2021 and he was scheduled to be seen by his neurosurgeon in August, 2021.  (Doc. 47-6 at 27-28; Doc. 47-7 at 1-8.)  According to Plaintiff, he was not being taken weekly to the Banner infectious disease clinic to assess the effective level of Posaconazole in his system; it is unclear whether such testing could have been or was being performed by Centurion staff at ADOC.  (Doc. 48.)

A July 9, 2021 HSE reported: Plaintiff's EMG showed cervical myelopathy;

---

[8]  Although unclear, Plaintiff was apparently dissatisfied with the level of physical therapy.

[9]  Plaintiff received Baclofen 20mg three times daily, acetaminophen 325mg four times daily, and Keppra 1000mg twice daily, among others.  (Doc. 47 at 2.)

TERMPSREF

Plaintiff was receiving baclofen for myalgias; his pain appeared more consistent with myalgia than neuropathy; Plaintiff asked about shoulder surgery and was informed the plan was for him to see neurosurgery first and finish his work up for his hydrocephalus and infectious disease consults before considering sending him back to Dr. Hamilton to assess whether he would benefit from shoulder surgery; and Plaintiff reported he wanted to return to his previous housing unit where he had ADA equipment.  (Doc. 47-6 at 1-16.)  In addition, the HSE reported Plaintiff had been informed of the benefits of Keppra versus gabapentin to treat neuropathy or nerve pain; Keppra had been shown "in some studies" to be effective in treating neuropathy with a spinal origin; and Plaintiff's EMG had been more consistent with muscle rather than nerve pain.[10]  (*Id.* at 15.)  On July 9, 2021, Plaintiff was discharged from "sub-acute level of care" to his previous unit.  (*Id.* at 17-22.)

On July 12, 2021, Plaintiff had an infectious disease follow-up appointment.  (*Id.* at 27-28; Doc. 47-7 at 1-8.)  It is unclear whether the infectious disease provider was aware of the discontinuation of gabapentin or the decreased dosage of Posaconazole for Plaintiff at ADOC.  On July 14, 2021, Dr. Armando DeGuzman reported an ICS after Plaintiff came to medical and reported feeling unwell and having symptoms like those before his June hospitalization and experiencing trouble breathing; Dr. DeGuzman ordered Plaintiff taken to an emergency room because there was no RN or NP available to assess him.  (Doc. 47-7 at 9-20.)  Plaintiff was again admitted to Banner Hospital.

In a Banner Hospital Consultation Report concerning Plaintiff's admission, Dr. Lim identified Plaintiff as a high-risk patient and reported a lumbar puncture might not be obtainable due to risk of herniation, a neurosurgery consult had been ordered, and Plaintiff had been placed on Posaconazole 200mg twice daily and liposomal amphotericin B 5mg/day for CNS coccidioidomycosis and began receiving antimicrobials.  (Doc. 47-7 at 33-34.)  Plaintiff also again began receiving 1200mg of gabapentin three times daily.  (Doc. 47-7 at 37.)  A brain CT was ordered, and Plaintiff's consent had to be obtained prior to a

---

[10]  This seemingly overlooked Plaintiff was, and had been, taking Keppra 1000mg daily, but still reported significant pain.  There is no indication Plaintiff's Keppra prescription could be or was increased to better manage his pain.

lumbar puncture due to the risk under the circumstances. (*Id.* at 35-39.)  Plaintiff consented to placement of a ventriculoperitoneal shunting to drain excess fluid when pressure around the brain built up. (*Id.* at 40-45.)  The surgery was performed on July 16, 2021. (*Id.*; Doc. 47-8 at 1-11.)

A subsequent progress note indicated Plaintiff's 1200mg of gabapentin three times a day needed to be de-escalated beginning July 19, 2021. (Doc. 47-8 at 11-15.)  Dr. Lim's July 18, 2021 Physician Progress Note reported Plaintiff's Posaconazole levels had decreased below the target goal after "outside physicians" decreased his Posaconazole from 200mg twice daily to 100mg twice daily. (*Id.* at 19.)  Dr. Lim stated Plaintiff should continue Posaconazole 200mg twice daily and would need to be on the medication for the rest of his life, but Dr. Lim discontinued liposomal amphotericin B 5mg following his July 18 dose. (*Id.* at 20.)  Dr. Lim noted a follow-up appointment with him was scheduled in August. (*Id.*)

In a July 20, 2021 Physician's Progress Notes, Plaintiff's attending physician noted Plaintiff had worked with physical and occupational therapists, who recommended "intensive IPR," i.e., rehabilitation. (*Id.* at 33.)  His physical therapy assessment stated Plaintiff would benefit from skilled inpatient physical therapy to address functional deficits following discharge from the hospital. (*Id.* at 49-54.)

On July 21, 2021, Plaintiff was discharged to Allegiant Healthcare of Phoenix. (*Id.* at 56-63.)  According to the discharge summary, Plaintiff would continue to take 1200mg of gabapentin three times daily and 200mg of Posaconazole twice daily. (*Id.* at 59.)  Plaintiff was scheduled for a follow-up in the neurosurgery clinic with Dr. Weinand and an infectious disease consult with Dr. Lim in August. (*Id.* at 61-62.)

According to Plaintiff's latest motion, Plaintiff has been returned to an ADOC facility.  Although Plaintiff represented that additional hospital records were attached to the motion, none were attached.

## II.    Standard for a Preliminary Injunction

A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil

Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'"  *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).  Further, under the Prison Litigation Reform Act, injunctive relief, prohibitory or mandatory, must be narrowly drawn and be the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**III.    Discussion**

In his motion for injunctive relief, Plaintiff claims he was denied medical care as a cost-saving measure by Centurion and its staff and specifically seeks the following: (1) a neurological consult to follow up on the results of a February 3, 2021 cranial MRI; (2) effective treatment of his ongoing spinal nerve pain, torn shoulder tendons, right ankle tendon pain, and right knee and hip pain; (3) a follow-up treatment for torn left shoulder tendons following a February 11, 2021, surgical consultation; (4) a follow-up evaluation or examination of his right ankle and associated pain; and (5) a follow-up evaluation or examination and treatment of his right knee and hip pain.

There is no question that Plaintiff suffers from serious health conditions, particularly disseminated coccidiomycosis resulting in meningitis, damage to his cervical spine, and hydrocephalus.  The record before the Court reflects two areas of concern between the treatment Plaintiff received while hospitalized and that received when he briefly returned to ADOC custody following his June hospitalization: (1) the abrupt discontinuation of gabapentin, and (2) the brief delay in receiving Posaconazole, followed by receiving half the dosage prescribed by Dr. Lim to stave off further occurrences of disseminated

1    Valley Fever.

2         During his June hospitalization through his rehabilitation at Allegiant, records

3    reflect Plaintiff received 1200mg of gabapentin three times daily.  However, upon his

4    return to ADOC custody, Plaintiff did not receive gabapentin; it is unclear whether

5    Centurion staff knew the high levels of gabapentin he had received during his

6    hospitalization and rehabilitation, but it is possible that the abrupt discontinuation of

7    gabapentin, particularly given the high dosages he had been receiving, jeopardized

8    Plaintiff.  The two to three-day lapse in Plaintiff receiving Posaconazole—perhaps due to

9    Plaintiff's abrupt decision to return to ADOC and time necessary to obtain it—does not

10   appear from the record to have harmed Plaintiff.  Troubling, however, is that when Plaintiff

11   resumed receiving Posaconazole, he received only half the dose ordered by Dr. Lim.  The

12   reason why Plaintiff was provided a reduced dosage is not apparent from the record,

13   although Dr. Lim indicated it was a decision by Plaintiff's ADOC providers.  The record

14   reflects follow-up appointments with Plaintiff's neurosurgeon and infectious disease are

15   scheduled sometime this month and he continued to receive the 1200mg of gabapentin

16   three times daily and 200mg of Posaconazole twice daily while at Allegiant.

17        Plaintiff, however, has failed to demonstrate he is entitled to the injunctive relief he

18   has requested.  He filed his motion for preliminary injunction prior to his two recent

19   hospitalizations and rehabilitations.  Plaintiff has only recently returned to an ADOC

20   facility following his second rehabilitation and there is *no* evidence before the Court to

21   support that the case Plaintiff is *currently* receiving at ADOC amounts to deliberate

22   indifference.  To the extent Plaintiff seeks a follow-up regarding his February 3, 2020 brain

23   MRI, such relief has been mooted by his recent hospitalizations.  Further, to the extent

24   Plaintiff seeks effective treatment of his spinal nerve pain, such request has been mooted

25   by his recent hospitalizations and surgeries, and the care he is *currently* receiving has not

26   been established.  His request for injunctive relief concerning his torn shoulder tendons,

27   right ankle tendon pain, right knee and hip pain must necessarily await his recovery and

28   rehabilitation following his recent hospitalizations, and follow-up appointments with

infectious disease, neurology, and neurosurgery physicians.  In short, the injunctive relief sought by Plaintiff in his motion has either been mooted by his two intervening hospitalizations and surgeries or must necessarily be delayed pending his follow-up consultations.  Absent any evidence concerning the care Plaintiff is *currently* receiving, and, a showing that such care is constitutionally deficient, the Court declines to enjoin Defendants to provide the relief sought in his motion.  For all these reasons, the Court will deny Plaintiff's motion for injunctive relief without prejudice.

**IT IS ORDERED:**

(1)     Plaintiff's motion for injunctive relief (Doc. 6) is **denied** without prejudice.

(2)     Plaintiff's motion for an emergency hearing (Doc. 45) is **denied** as moot.

(3)     Plaintiff's Emergency Motion for Ruling (Doc. 49) is **denied** as moot.

(4)     This matter is **assigned to the standard track** pursuant to Rule 16.2(b)(3) of the Local Rules of Civil Procedure.

(5)     An Order setting a Rule 16 Conference will issue separately.

Dated this 12th day of August, 2021.

_____
Honorable John C. Hinderaker
United States District Judge