Stacy Scheff #028364
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611
Tucson, AZ 85717
Ph: (520) 471-8333 – Fax: (520) 300-8033
Email: Stacy.Scheff@gmail.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Brightly,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Corizon Health Inc., et. al.<br><br>　　　　Defendants. | Case No. 4:21-cv-127-JCH-PSOT<br><br>**FIRST AMENDED COMPLAINT**<br><br>Hon. John C. Hinderaker |

## A. JURISDICTION

1. This Court has jurisdiction over this action pursuant to: 28 U.S.C. § 1343(a); 42 U.S.C § 1983.

2. Institution/city where violation occurred: ASPC Tucson Complex, Manzanita Unit – Tucson AZ.

## B. DEFENDANTS

3. Name of first Defendant: Corizon Health Inc. This Defendant was employed as: Health Care Contractor at ADOC Tucson, Statewide.

4. Name of second Defendant: Centurion of Arizona LLC. The second Defendant is employed as: health Care Contractor at ADOC Tucson, Statewide.

5. Name of third Defendant: Natalie Bell. This Defendant is employed as: N.P./Provider medical care at ASPC Tucson Complex. Defendant Bell is sued in

her individual capacity.

**6.** Name of fourth Defendant: Nick Salyer.  This Defendant is employed as Physician Assistant Centurion at ASPC Tucson Complex.  Salyer is sued in his individual capacity.

**7.** Name of sixth Defendant: Dorothy Hines.  This Defendant is employed as N.P. Provider medical care at ASPC Tucson Complex.  Defendant Hines is sued in her individual capacity.

**8.** Name of seventh Defendant: Laura Elliot.  Thish Defendant is employed as N.P. Provider medical care at ASPC Tucson Complex.  Defendant Elliot is sued in her individual capacity.

**9.** Name of eighth Defendant: A. Ferguson.  This Defendant is employed as FHA – Facility Health Administrator at ASPC Tucson Complex.  Defendant Ferguson is sued in their individual capacity.

**10.** Name of tenth Defendant: David Shinn, Director of Corrections. The tenth Defendant is employed as Director at ADOC Phoenix.

## C. PREVIOUS LAWSUITS

**11.** Have you filed any other lawsuits while you were a prisoner? No.

## D. CAUSE OF ACTION

### COUNT I – Medical Care

**12.** State the constitutional or other federal civil right that was violated: Civil right – Eighth Amendment.

**13.** Christopher Brightly ("Plaintiff") at all relevant times, was a prisoner in the

1  custody of the Arizona Department of Corrections ("ADOC").

2  **14.** In the year 2018, the ADOC had contracted with Corizon Health Inc. ("Corizon"),

3  a for-profit healthcare contractor, to provide healthcare to ADOC prisoners, to

4  include Plaintiff.

5  **\*MENINGITIS SPINE – VALLEY FEVER – HYDROCEPHALUS BRAIN\***

6  **15.** Some time around mid-2018, Plaintiff began to experience the following

7  difficulties: sensitivity to light, loss of physical coordination, loss of energy, loss

8  of appetite, Plaintiff made these facts known via health needs requests ("HNRs")

9  and via verbal communications with Corizon/medical staff.

10 **16.** In November or December of 2018, Plaintiff began to struggle with actions of

11 daily normal living, this included walking. Plaintiff was forced to borrow other

12 prisoners' wheelchairs to ambulate or moved to different appointments, bathroom,

13 shower.

14 **17.** In November or December of 2018, Plaintiff was using a borrowed wheelchair to

15 receive his daily medication which was being issued in the building where he

16 resided (Housing Unit #5), the nurse dispensing medication (Espinoza), requested

17 that Plaintiff stand up – out of said wheelchair – and consume his medication

18 orally.

19 **18.** Plaintiff stood up as ordered and was handed his medication in a small plastic

20 container, as Plaintiff tilted his head back to put the medication in his mouth, he

21 experienced a black-out and fell to the floor.  On this same day, Plaintiff would be

22 moved to the Manzanita Special Needs Building (House #6), to receive 24 hour

nursing care.

19. As weeks and months elapsed, Plaintiff's physical and psychological health rapidly continued to deteriorate, Plaintiff began to experience frequent falls resulting in numerous medical emergencies ("ICS") being initiated by Corrections Officers.

20. Plaintiff tore tendons in both shoulders as a result of these aforementioned falls.

21. Plaintiff eventually lost the ability to get out of bed or stand on his own. Plaintiff lost the use of his hands, and began to suffer with incontinence.

22. Plaintiff's cognitive abilities would rapidly diminish.

23. Plaintiff could no longer tolerate light, when Plaintiff attempted to sit up too fast, he would lose consciousness and/or experience convulsions at that time.

24. An x-ray revealed that Plaintiff had severe damage to his spine, in and around his neck.  A neck brace was ordered, Plaintiff never received this neck brace.

25. Plaintiff suffered with extreme continuous pain, yet his pain went untreated.

26. Defendant Natalie Bell was Plaintiff's treating healthcare provider and was responsible for obtaining a diagnosis for Plaintiff's condition and providing subsequent treatment.  Defendant Bell was fully aware of Plaintiff's symptoms.

27. Upon information and belief, Defendant Bell failed and/or refused to obtain diagnostic testing of Plaintiff's condition and presenting symptoms in order to cut costs.

28. Upon information and belief Defendant Bell fully understood that Plaintiff had a serious – possibly deadly – medical condition/emergency and requested diagnostic

testing (an MRI) as a result. Defendant Bell would subsequently accept alternative treatment plans (ATP's), which were defacto denials of a diagnosis(s), and required treatment(s).

**29.** Defendant Bell accepted said ATP without Plaintiff's knowledge or consent.

**30.** Upon information and belief Defendant Bell accepted said ATP for Plaintiff's healthcare needs to cut costs and bolster the profit margin for Corizon – Bell's employer.

**31.** Defendant Nick Salyer was Plaintiff's treating healthcare provider and was responsible for obtaining a diagnosis for Plaintiff's condition and providing subsequent treatment. Defendant Salyer was fully aware of Plaintiff's symptoms.

**32.** Upon information and belief Defendant Salyer failed and/or refused to obtain diagnostic testing of Plaintiff's condition and presenting symptoms in order to cut costs.

**33.** Upon information and belief Defendant Salyer fully understood that Plaintiff had a serious – possibly deadly – medical condition/emergency and requested diagnostic testing (MRI) as a result. Defendant Salyer subsequently accepted (ATP)'s, which were defacto denials of a diagnosis and required treatment.

**34.** Defendant Salyer accepted said ATP without Plaintiff's knowledge or consent.

**35.** Upon information and belief Defendant Salyer accepted said ATP for Plaintiff's healthcare needs in order to cut costs and bolster the profit margin for Corizon – Salyer's employer.

**36.** Upon information and belief Defendant Corizon's Utilization Management

("UM") reviewed Defendant Salyer's and Defendant Bell's requests/orders for diagnostic testing of Plaintiff's condition, to include but not limited to "MRI's" (for the spine), and orthopedic consultion (for the shoulders), but rejected the diagnostic's and the consultations as a cost cutting measure (s).

37. Upon information and belief Defendant Corizon implemented a practice, pattern, and custom of rejecting provider requested consultations, diagnostics "MRI's", when subsequent diagnoses could lead to costly treatment.

38. Upon information and belief Defendant Corizon implemented a practice, pattern, and custom of instructing its employees/providers not to request diagnostics and/or consultations, "MRI's" for patients to cut costs and in order to avoid costly treatment (s).

39. By June or July of 2019, Plaintiff was now in a severe state of moribound, that an unknown individual had Plaintiff transported to the emergency room ("E.R.") via an ambulance.

40. While in the "ER" it was determined that Plaintiff had severe valley fever, spinal meningitis, hydrocephalus, severe bone and nerve damage in the spinal cord, - inter alia.

41. Plaintiff remained hospitalized for approximately three (3) weeks, while he underwent intraveinous drug treatment(s) for the valley fever and meningitis infections.  Due to fact that the infections went untreated for so long a period, the Plaintiff required a lamenectomy – titanium implants in his spine/neck region.

42. Upon release from the hospital, Plaintiff was sent to a live-in rehabilitation

("rehab.") center for 3 weeks, where he underwent physical examination(s) and physical therapy ("PT")

43. Upon information and belief Plaintiff's treating physical therapist(s), and/or doctors at the rehab determined that the tendons in Plaintiff's shoulders were torn, as a result of the falls that occurred while he suffered with the valley fever, meningitis, hydrocephalus infections. Thus MRI's were recommended, orthopedic consultation(s), and further extensive PT (full body), inter alia.

### SHOULDERS/PT/PAIN:

44. In the month of July 2019, the ADOC terminated defendant Corizon's contract for healthcare services within the ADOC system. The healthcare services contract was assumed by Defendant Centurion of Arizona (LLC), ("Centurion"), a for-profit healthcare vendor.

45. Upon release from the live-in rehab. - in or around the month of July 2019 – Plaintiff was returned to the ADOC at Manzanita Unit with the aforementioned recommendations for MRI (shoulders), orthopedic consultation(s) (shoulders), and further PT (full body), inter alia.

46. Upon information and belief Nonparty Jillian Riley, Plaintiff's Centurion provider, reviewed the aforementioned recommendations from the live-in rehab. And refused to implement them.

47. Upon information and belief Nonparty Jillian Riley requested that Plaintiff be sent to Simons PT for a second opinion; as a result Plaintiff was sent to Simons PT in or around September 2019, where upon he underwent a physical examination.

48. Upon information and belief Stacy Simons Physical Therapist opined that the tendons in Plaintiff's shoulders were torn and required an MRI and surgical intervention.  Plaintiff further believes that Stacy Simons also recommended a full body course of PT, inter alia.

49. Upon information and belief Nonparty Riley reviewed Stacy Simons recommendations and chose to disregard these as a cost-cutting measure.

50. In or around May 2020, Plaintiff had a Health Services Encounter ("HSE"), with Defendant Dorothy Hines, a Centurion provider regarding ongoing pain in Plaintiff's shoulders and knee.

51. During the May 2020 HSE with Defendant Hines, Plaintiff explained that Stacy Simons recommended an MRI, and a surgical consultation for Plaintiff's shoulders.  Defendant Hines completed a physical examination and stated that Plaintiff needed both shoulder joints, along with the right knee surgically replaced. The Plaintiffs continuing pain went untreated.

52. Defendant Hines; having the full understanding now that Plaintiff was suffering unnecessary pain, and was in need of orthopedic corrective surgery, chose not to place the requisite orders/requests to have Plaintiff then evaluated by an orthopedic surgeon nor diagnostic MRI.

53. Plaintiff continued to submit HNR's in which he complained of continual ongoing pain, and limited use of his shoulders.  As a result Defendant Hines ordered an MRI for Plaintiff's right shoulder – approximately (6) months after the May 2020 HSE.  Plaintiff's pain went untreated.

54. In or around May 2020, Plaintiff was sent to a post-surgical follow-up with a neurosurgeon – in regards to the Plaintiff's spine and brain. This neurosurgeon recommended that Plaintiff have a consultation with a neurologist in order to determine the next step(s) in Plaintiff's care.

55. Upon information and belief Defendant Hines reviewed the recommendations of the neurosurgeon and chose to disregard them.

56. Plaintiff continued to submit HNR's and made oral complaints of spastic nerves, nerve pain in his spine and body, dizziness, headache, and loss of balance. Plaintiff's continuing pain went untreated.

57. In September 2020, Plaintiff was sent to neuro-west for a consultation with a neurologist who received no background, no medical records about Plaintiff's condition. Even so, the neurologist submitted the following care recommendation: A) a cranial MRI (brain), to determine the amount of fluid in Plaintiff's skull, extent of brain damage from the fluid (infection), B) Diazapam – for the nerve pain and spastic nerves, C) PT.

58. Upon information and belief Defendant Hines reviewed these recommendations of this neurologist and chose to disregard them.

59. Plaintiff continued to complain via HNR's and oral complaint of ongoing nerve pain, spastic nerves in his spine and body, headache, dizziness, loss of balance, Plaintiff's pain went untreated.

60. In or around November of 2020, Plaintiff had an MRI of his right shoulder only, this MRI revealed several torn tendons in the shoulder joint, one of these tendons

is nearly severed.  Plaintiff's shoulder pain continued to go untreated.

**61.** On 12-14-2020, Plaintiff submitted an informal grievance, in which Plaintiff complained that the recommendations of his treating neurologist were not being followed.

**62.** On 12-23-2020, Plaintiff had a consultation with an orthopedic specialist who recommended that Plaintiff have a consultation with an orthopedic surgeon. Plaintiff ongoing shoulder pain continued to go untreated.

**63.** On 01-11-2021, Plaintiff submitted a formal grievance, Plaintiff stated that the recommendations of his treating neurologist continued to be disregarded to include, but not limited to an MRI, Plaintiff requested damages.

**64.** As a result of this 01-11-2021 grievance, Plaintiff had an MRI of his brain on 02-09-2021, this MRI revealed large amounts of fluid on his brain and within his skull. The reviewing radiologist, Dr. Derek McAllistar would recommend "clinical correlation and attention on follow-up.

### RIGHT LEG, RIGHT ANKLE

**65.** In July or August of 2020, Plaintiff was examined by an orthopedic specialist who prescribed plaintiff orthotic shoe(s), one with a lift, along with an orthotic foot/ankle brace. ("Ortho. Equip.")

**66.** This "Ortho. Equip" was prescribed the shoe with lift due to the right leg being shorter than his left leg.  The "Ortho. Equip." - foot/ankle brace is prescribed due to a "drop-foot" condition. A permanent neurological disorder caused by Plaintiff not being treated for the "Valley Fever Infection" and "Meningitis Infection".

67. Upon information and belief defendants NP Hines and Centurion were made fully aware of the Plaintiff's medical need for this "Ortho. Equip." Defendant Hines chose to deny this "Ortho. Equip." to Plaintiff as a cost cutting measure.

68. In early November 2020, approx. 4 to 5 months after this denial by defendant Hines, Plaintiff would fall to the floor with severe injury to the right ankle. Due to this injury Plaintiff was unable to walk or bear any type of weight on the swollen and severely painful ankle – a medical emergency ("ICS") was initiated.

69. Plaintiff would then be transported to the manzanita health unit via wheelchair. Having been examined by medical staff, Plaintiff was issued an ace wrap for his injured ankle, there was no further care, nor would medication be issued for the severe swelling, and no pain killer of any type was issued.

70. Plaintiff would continue to suffer with severe pain and swelling, he submitted several HNR's asking for a diagnosis and treatment for this painful injury. Plaintiff was then x-rayed showing this right ankle to be fractured. Several days later he was issued a wheelchair for approx. (3) weeks. Plaintiff was denied pain medication, or any other treatment by defendant Hines at this time.

71. Plaintiff would submit HNR's complaining of ongoing pain and swelling, an MRI was ordered on 12-28-2020, revealing a split/tear of the ("peroneus brevis"). Plaintiff's condition would go untreated, the ongoing pain would go untreated also.

72. On 01-04-2021, Plaintiff submitted an informal requesting he be sent to see an orthopedic specialist. Plaintiff received a response to this informal on 01-06-2021,

stating "an appointment had been requested for an orthopedic examination to determine an appropriate treatment plan." Plaintiff was not sent to an orthopedic doctor.

73. On 03-09-2021, Plaintiff was seen by Nurse (Sweetapple) who processed the 03-07-2021 also the 03-08-2021 HNR's. The nurse stated that both HNR's would be forwarded to Defendant Elliot for review; an examination of the Plaintiff's knees and right hip never took place.

74. Upon information and belief Defendant Centurion instructed its' employees (via unwritten policy) not to follow through with recommendations from "outside" specialists concerning "ADOC prisoners" as a cost cutting measure.

75. Upon information and belief Defendant Centurion instructed its' employees (via unwritten policy), not to request "costly" "outside" healthcare for ADOC prisoners to include but not limited to MRI's, orthopedic consults, diagnostics that could lead up to costly surgeries or healthcare treatments.

76. Upon information and belief Defendant Centurion instructed its' providers not to conduct physicals or diagnose patients' injuries (via unwritten policy).

**DENIAL OF E.M.G., PAIN TREATMENT**

77. Between 12-23-2020 to 03-08-2021, Plaintiff submitted a minimum of "12" HNR's, in which he complained of his ongoing untreated pain, as a result he would have a HSE, Health Services Encounter with Defendant Laura Elliot, Nurse Practitioner.

78. In response Defendant Elliot stated "there is no point to sending you to a pain

clinic, as they will recommend opiates, and we "do not" prescribe opiates here".

Plaintiff was not offered nor prescribed any form of pain management.

**79.** On 01-22-2021, Plaintiff explained to Defendant Elliot that he was suffering with intense nerve pain in the surgically reconstructed spinal area, along with severe nerve pain throughout his body. Defendant Elliot acknowledged fully Plaintiff's injury and nerve pain but chose not to treat this pain in any form.

**80.** On 02-27-2021, Plaintiff submitted an HNR requesting the nerve pain medication (Diazipan), recommended per the treating neurologist seen in September of 2020. Plaintiff stated in part "the current medication prescribed by the [Centurion] provider is ineffective as I still suffer with intense [nerve] pain." In his shoulder(s) and body.

**81.** On 02-27-2021, Plaintiff also submitted an HNR requesting he be sent to a pain clinic to evaluate the "severe pain" in his shoulders.

**82.** On 03-03-2021, Defendant Elliot notified Plaintiff that she had accepted an alternative treatment plan ("ATP") for the ("EMG"), nerve testing requested by Plaintiff's ortho. shoulder surgeon. Defendant Elliot could not explain what this ATP was or consisted of as treatment.

## GRIEVANCES AND ONGOING PAIN

**83.** Plaintiff has submitted at least (4) formal grievances which concerned his ongoing and untreated pain he suffers. Defendant A. Ferguson – ASPC Tucson Facility Health Administrator ("FHA"), responded to these grievances stating in part, "pain management has already been discussed between the provider and yourself – (that

there will be no new pain orders at this time)".

84. Defendant Ferguson, denied Plaintiff adequate pain medication/treatment. This even after drawing the inference and fully aware that Plaintiff was suffering with ongoing pain, - (via aforementioned grievances). This in accordance with Defendant Centurion's practice, pattern, and custom of deliberate indifference towards prisoners' needs, suffering and pain.

## INJURY

85. Defendant Bell drew the inference that Plaintiff was faced with a deadly and/or life altering illness/conditions and was suffering with acute pain. Defendant Bell refused to obtain a diagnosis of the Plaintiffs condition, or treat plaintiffs condition.

86. Defendant Bell accepted meaningless ATP's for needed healthcare, which amounted to defacto denials of treatment.

87. Defendant Bells refusal to obtain a diagnosis and treat Plaintiff's illness/conditions constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

88. Defendant Salyer drew the inference that Plaintiff was faced with a deadly/and/or life altering illness/conditions, and was suffering with acute pain. Defendant Salyer refused to obtain a diagnosis of Plaintiff's condition, or treat Plaintiffs' condition.

89. Defendant Salyer accepted meaningless ATP's for needed healthcare, which amounted to defacto denials of treatment.

90. Defendant Salyers refusal to obtain a diagnosis and treat Plaintiff's illness/conditions constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

91. Defendant Corizon had an unwritten policy of restricting, if not outright denying diagnostic testing and other forms of healthcare if such healthcare was expensive, or could lead to expensive care/treatment.

92. Defendant Bell and Defendant Salyer followed Defendant Corizon's unwritten policy when they refused to order diagnostic testing, accepted meaningless ATP's for diagnostic testing, and refused to treat Plaintiff's serious medical needs/condition.

93. The failure of Defendant Corizon to authorize diagnostic testing for Plaintiff's condition despite its' full knowledge of Plaintiff's severe medical illness/conditions constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

94. As a result of these failures/refusals of Defendant Corizon, Salyer and Bell to provide needed diagnostic testing and appropriate medical treatment, Plaintiff has suffered physical injury, permanent disability, unnecessary suffering, pain, and emotional pain, trauma and injury.

95. The refusal of Nonparty Riley to follow the recommendations of Stacy Simons, Physical Therapist; to have the torn tendons in Plaintiff's shoulders treated constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

96. The refusal of Defendant Hines to treat Plaintiffs pain, request specialty diagnostics (MRI & surgery) for right shoulder and right knee, request (MRI & surgery) for both shoulders, refusing to follow recommendations of Plaintiff's treating neurologist, failure to make timely request for orthotic equipment for Plaintiff's right ankle, constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

97. The refusal of Defendant Elliot to treat Plaintiff for pain, examine Plaintiff's hip, knee, shoulders.  Refusing to follow recommendations of Plaintiff's treating neurologist, the fact that Elliot accepted a meaningless ATP in place of a recommended/required EMG constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

98. The refusal of Defendant A. Ferguson to ensure that Plaintiff was treated adequately for pain, even after investigating aforementioned grievances constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

99. Defendant Salazar was aware that Plaintiff was bed ridden and dying a slow painful death, yet instructed his subordinates to stay quiet and do nothing.  Dr. Salazar continues to instruct his subordinates not to treat Plaintiff's condition and pain, despite knowledge of said pain.  Such actions constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

100. Defendant Centurion has an unwritten policy of restricting, withholding,

and outright denying ADOC prisoners needed healthcare – in order to cut costs.

101. Defendants Elliot, Hines, and Ferguson followed Defendant Centurion's unwritten policy when they one and all refused/and/or failed to treat Plaintiff's serious medical care and needs.

102. As a result of Defendants Centurion, Hines, Elliot, and Ferguson's failure/refusal by one and all to adequately treat Plaintiff's serious medical needs, Plaintiff has suffered with further injury(ies), needless and unnecessary physical pain, emotional pain and injury that is ongoing.

103. Defendant Shinn has allowed a culture of deliberate indifference to continue to exist in the ADOC which has injured Plaintiff permanently, Plaintiff now seeks preliminary injunctive relief.

**FACTUAL ALLEGATIONS AGAINST DEFENDANT SHINN**

104. Defendant Shinn is a final policymaker of the State of Arizona on matters relating to incarcerated individuals in the custody of the Arizona Department of Correction. As a result of Arizona state statute, Defendant Shinn's edicts or acts may fairly be said to represent official policy of the state on these matters, including the provision of health care to prisoners such as Plaintiff.

105. Defendant Shinn has overall responsibility to ensure that prisoners within the custody of the Arizona Department of Corrections are afforded constitutionally minimal treatment, as measured by the Eighth Amendment.

106. During Defendant Shinn's tenure as the Director of the Arizona Department of Corrections, he has presided over the creation of policies and customs that are

the proximate cause of Plaintiff's immediate constitutional harm complained of in this action.

107.  Upon information and belief, Defendant Shinn was personally involved in negotiations with Defendant Centurion during May and June of 2021 for the purpose of signing a new contract to provide healthcare to Plaintiff and other prisoners for an additional 18 months. Upon information and belief, Defendant Shinn re-negotiated this contract, despite Defendant Shinn's personal knowledge that Defendant Centurion had consistently provided constitutionally inadequate medical care to hundreds of prisoners throughout during that company's initial contract period with the Arizona Department of Corrections.

108.  Upon information and belief, Defendant Shinn is personally aware of dozens of examples of Defendant Centurion willfully disregarding the serious medical needs of prisoners under the custody of the Arizona Department of Corrections. For example, Defendant Shinn is personally aware of the allegations in the lawsuit currently pending in the District of Arizona, *Parsons v. Shinn* (previously, *Parsons v. Ryan*).

109.  Upon information and belief, Defendant Shinn regularly reviews reports and updates provided by senior management at Defendant Centurion, and regularly receives updates regarding the developments in the Parsons v. Shinn lawsuit, as it pertains to allegations against Defendant Centurion.

**110.** Upon information and belief, Defendant Shinn was aware of and regularly received such updates prior to re-negotiating the contract with Defendant Centurion in May and June of 2021.

**111.** As the final policymaker on matters related to constitutionally minimal provision of medical care to prisoners housed within the Arizona Department of Corrections, Defendant Shinn has the authority under Arizona law to remedy Eighth Amendment violations suffered by Plaintiff, through changes to policy and custom.

### E. REQUEST FOR RELIEF

State the relief you are seeking:

A) Grant Plaintiff's emergency motion for preliminary injunctive relief.

B) Award Plaintiff his cost and fees.

C) Compensatory damages and punitive damages to be decided by jury.

D) Any other form of relief the Court deems appropriate.

Submitted this 4th day of November, 2021 by

Stacy Scheff
Stacy Scheff #028364
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611
Tucson, AZ 85717
Ph: (520) 471-8333 – Fax: (520) 300-8033
Email: Stacy.Scheff@gmail.com
Attorney for Plaintiff